IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,

Plaintiff,

v.

MARVIN DENNIS,

Defendant.

Criminal No. 26-00017
ELECTRONICALLY FILED

**MEMORANDUM ORDER**

Before the Court is *pro se* Defendant's Motion to Suppress Physical Evidence. ECF 37. The Court held a hearing on this motion on September 23, 2026, and invited the Parties to submit their positions following the hearing. Defendant submitted his document styled "Defendant's Reply Brief in Support of Motion to Suppress Physical Evidence" (ECF 53) on October 29, 2026, and the Court filed same on his behalf following an in-person conference with him and counsel. On November 4, 2026, the Government filed their Brief in Opposition to Defendant's Motion to Suppress. ECF 54. The matter is now ripe for adjudication, and for the reasons that follow, Defendant's Motion to Suppress will be denied.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Procedural Background

Defendant, who was on supervised release at the time of his arrest for the instant offense,[1] was indicted on February 3, 2026, for possession of a firearm and ammunition by a convicted felon in violation of 18 U.S.C. 922(g)(1). The indictment specifically charged that on

[1] Defendant pled guilty to conspiracy to distribute heroin, fentanyl and crack cocaine and possession of a firearm in furtherance of a drug trafficking crime, and was sentenced by this Court on June 28, 2019, to 72 months' imprisonment and three years' supervised release. *See United States of America v. Marvin Dennis,* 2:18-cr-00221 at doc. no. 112.

November 4, 2025, Defendant, knowing he had previously been convicted of a crime punishable by a term of imprisonment exceeding one year, knowingly possessed a firearm (a Glock 23 .40 caliber pistol) and ammunition (.40 caliber ammunition). ECF 3.

Initially, Defendant was represented in this matter by a very experienced federal criminal attorney who had been appointed to his case, but about five months after this case commenced, Defendant asked the Court if he could represent himself. The Court conducted a *Frye* colloquy and determined that Defendant was indeed competent and knowingly understood the risks of self-representation and therefore, agreed to permit Defendant to represent himself but appointed his former attorney to serve as stand-by counsel. ECF 35.

Shortly thereafter, on July 30, 2026, Defendant filed his Motion to Suppress (ECF 37), and the Court held a Suppression Hearing on September 23, 2026. During the hearing, the Court heard live testimony from Pittsburgh Detective Robert Pokora and Pittsburgh Patrol Officer Robert Fraino. The Court also viewed November 4, 2025 video footage from a camera located at the intersection of Knox Avenue and Rochelle Street in Pittsburgh (Government Exhibit 1) as well as body camera footage from a camera worn by Officer Fraino (Government Exhibit 8).

**B. Factual Background**

According to the testimony presented and camera evidence the Court finds as fact:

On November 4, 2025, around 11:30 p.m., Detective Pokora, was on duty in the Violence Prevention Unit located on the North Side of Pittsburgh. His job duties that evening required him "work the camera" positioned at the intersection of Knox Avenue and Rochelle Street. ECF 48, p. 6. Det. Pokora explained that given his six years of working in that zone (Zone 3), he was

conducting surveillance in that area because he knew the location was a high crime area.[2] ECF 48, p. 13. Det. Pokora testified as to what he observed that evening:

> A. . . . So I was conducting surveillance in this area, using this camera. And I observed a male who I see in the courtroom today, he's sitting down over to my right wearing a red shirt, he's walking down Rochelle Street towards Grimes. He begins to illuminate the inside of parked vehicles using a flashlight that's attached to a firearm, believing that he is looking to break into vehicles. I then, along with Detective Cancilla, call out over Channel 2, which is the Zone 3 radio channel, and alerted the officers in the area to the suspicious behavior.
>
> Q. And did he also -- other than just flashing the flashlight attached to the firearm into vehicles, did he do any other suspicious activity during the course of this?
>
> A. Yes. As he was walking down the street, another car started approaching him from the rear, at which point he turns, looks at the car, and then goes back behind the vehicles again, appearing to try to conceal himself. As soon as that vehicle passes, he then comes right back out into the street.

ECF 48, p. 9.

The Court then viewed the recording of the events that Det. Pokora observed and found that what transpired on the recording matched Det. Pokora's verbal recitation of the event.

The Court was able to observe an individual wearing all black – a black puffer coat and black pants – and at the beginning of the video, he was positioned near a Ford Taurus. The Court observed this person flashing a light into the cars that were parked along the street as he walked past each vehicle.

---

[2] Det. Pokora testified that this area was known for its "[v]iolent crimes such as shootings, fights, assaults, robberies, . . . as well as theft of vehicles, burglaries," and also noted there was "a lot of drug activity in this area." ECF 48., p. 7. Det. Pokora also noted that during his tenure as a plainclothes officer in Zone 3, there was a "detail dedicated to specifically to theft from vehicles" in this specific area. Id., p. 13.

When Det. Pokora realized the individual was carrying a firearm, he alerted the patrol officers in the neighborhood providing them with a description of the individual (Defendant) and his direction of travel.

Det. Pokora admitted that he could not see the person's facial features on the camera but was able to note that the individual was wearing all black clothing, which contributed to his suspicions concerning the person's activity especially given that this person was beaming a light into the parked cars. ECF 48, p. 15-16. Det. Pokora also noted that when a moving vehicle came along on the same street where Defendant was located, Defendant moved to walk behind a parked car, and then returned to walking along the street after the car pulled away. Id., p. 26. In short, Det. Pokora interpreted the actions of the Defendant (wearing dark clothing and walking by vehicles while shining a light into them) as indicative of him looking for something to steal. Id., p. 19. In sum, Det. Pokora stated, "I observed [Defendant] attempting to look into vehicles to look for valuables. And then I called out over the air of [Defendant's] behavior and location." Id., p. 29. Det. Pokora further explained, "I did not know that the person in the camera was Marvin Dennis when I was observing the camera footage, but I knew that Marvin Dennis was a person not to possess firearms. . . ." Id. p. 33.

Officer Fraino testified that he has worked a patrol for ten years in Zone 3, the zone where Defendant was observed and arrested on November 4, 2025. On November 4, 2025, Officer Fraino was on duty and was the person who arrested Defendant. Id., p. 37. Officer Fraino testified that he received a call from detectives working at the Violence Protection Unit notifying him that "a black male wearing a winter black coat, black pants and . . . white shoes" was armed with a pistol with a flashlight attachment and "was using that flashlight to look into vehicles." Based on this call, Officer Fraino went looking for this person.

The Court viewed Officer's Fraino's body camera footage and observed the apprehension and arrest of Defendant, as well as Defendant dropping his weapon after trying to conceal it in his left armpit before and during the stop. Id., p. 42-43. Defendant was told to get down on his knees and as Defendant was being placed in handcuffs and assisted to a standing position, the gun fell away from Defendant onto the ground where anther police officer secured the weapon. Id., p. 43.

**II. ANALYSIS**

The Fourth Amendment forbids "unreasonable searches and seizures." But several exceptions – such as a *Terry* stop – apply. Under *Terry* and its progeny, an officer may "conduct a brief, investigatory stop when [he] has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000); *United States v. Goerig*, 111 F.4th 276, 279 (3d Cir. 2024). Although reasonable suspicion is less demanding than probable cause, the Fourth Amendment does require that an officer making a stop have some level of objective justification for that stop. *United States v. Sokolow,* 490 U.S. 1, 7, (1989); *United States v. Bonner*, 363 F.3d 213, 217 (3d Cir. 2004). The Court must look at the totality of the circumstances, and ask if "a reasonable, trained officer standing in the officer's shoes could articulate specific reasons" to justify the seizure. *United States v. McCants*, 952 F.3d 416, 422 (3d Cir. 2020) (brackets and internal quotation marks omitted). By relying on the totality of the circumstances, police officers can draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person. *United States v. Arvizu*, 534 U.S. 266, 273 (2002).

The United States Court of Appeals for the Third Circuit has further explained:

> We afford significant deference to a law enforcement officer's determination of reasonable suspicion. Police are allowed to utilize "their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *Graves*, 877 F.3d at 499 (internal quotation marks and citation omitted). "[A] trained officer may find reasonable suspicion 'based on acts capable of innocent explanation.' " Id. (citation omitted). "[W]e must consider the totality of the circumstances, including the police officer's knowledge, experience, and common sense judgments about human behavior." *United States v. Robertson*, 305 F.3d 164, 167 (3d Cir. 2002); see also *Graves*, 877 F.3d at 498 (emphasizing that courts must look to "the totality of the circumstances leading up to the moment of the defendant's seizure" when assessing reasonable suspicion).

*United States v. Foster*, 891 F.3d 93, 104 (3d Cir. 2018). More recently, the Court of Appeals noted:

> Suppressing evidence is a grave measure designed to deter blameworthy misconduct . . . . Excluding evidence is strong medicine. A fair, accurate trial depends on an informed jury, so keeping it in the dark is a "last resort." *Hudson v. Michigan*, 547 U.S. 586, 591, 126 S.Ct. 2159, 165 L.Ed.2d 56 (2006). Courts should thus suppress evidence only when there is a very good reason that outweighs the "substantial social costs." Id. (*quoting United States v. Leon*, 468 U.S. 897, 907, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984)).
>
> There is one good reason to exclude ill-gotten evidence: to prevent future police misconduct. *Herring v. United States*, 555 U.S. 135, 139–41, 129 S.Ct. 695, 172 L.Ed.2d 496 (2009). Suppressing the fruits of illegal searches could deter officers from flouting the law or recklessly disregarding it. *See id*. at 143, 129 S.Ct. 695. So "[t]o trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Id*. at 144, 129 S.Ct. 695. "[D]eliberate, reckless, or grossly negligent [mis]conduct" fits the bill, as can some "recurring or systemic negligence." *Id*. Relying on these passages from Herring, we have excluded evidence because the police misconduct in that case "was, at a minimum, 'grossly negligent.' " *United States v. Vasquez-Algarin*, 821 F.3d 467, 484 (3d Cir. 2016) (quoting Herring, 555 U.S. at 144, 129 S.Ct. 695).

*United States v. Walker*, 191 F.4th 715, 717–19 (3d Cir. 2026).

Turning to the facts presented in this case, Det. Pokora, an 11-year police veteran in Zone 3 – the same area where Defendant was walking on November 4, 2025, at 11:30 pm – observed an individual, dressed in all black clothing, shine a light into each of the parked vehicles he passed. Det. Pokora knew this area from personal experience to be a high crime area – and one where theft of items from vehicles was an on-going problem. Moreover, the light from the flashlight, when reflected back onto Defendant from the car windows, illuminated the extended magazine of gun. Additionally, Defendant appeared to have tried to conceal himself when a (civilian) car came down the street. All of these observations combined with Det. Pokora's knowledge and personal experience in the area gave rise to a reasonable suspicion that criminal activity was afoot, and caused him to notify the patrolmen who were on duty in the area that evening.

Furthermore, when Defendant was apprehended by police officers, Defendant only partially raised his left arm, in an attempt to conceal the weapon under his left arm. Officer Fraino's body camera footage showed Defendant hesitate to comply with the patrolmen's directives to raise his arm, showed him only partially raising his left arm in response to their commands, and at no time did Defendant notify the police officer that he was armed. The gun was recovered once it fell away from Defendant as he was being detained.

Although Defendant claims that Det. Pokora did not know who he was viewing through the camera the night of November 4, 2025, this is of no moment. Based on Det. Pokora's observations, experience, and knowledge about the specific area where Defendant was walking, reasonable suspicion existed to stop whomever was walking along the street at 11:30 pm that night, while wearing all-black clothing, and shining the light from a gun into each parked car he passed.

## III. CONCLUSION

The totality of the circumstances present in this case, including: (1) the late hour (11:30 pm), (2) Det. Pokora's knowledge about the area being a high crime neighborhood, (3) his precise experience as a former plainclothes officer in that neighborhood, (4) his own observations through the camera of Defendant's all-black attire, (5) his observation of Defendant shining a light into parked cars as he walked past each vehicle, (6) his observation (due to the reflection of the flashlight's light) of the magazine of the pistol Defendant was carrying, supports a finding that Det. Pokora had reasonable suspicion to stop Defendant. Detective Pokora's observations combined with his years of experience on the police force in Zone 3 gave Detective Pokora reasonable suspicion to believe that Defendant was engaged in illegal activity. Accordingly, this Court concludes that the gun Defendant was carrying with him that night should not be suppressed.[3]

Defendant's motion is therefore, DENIED.

SO ORDERED, this 6th day of November, 2026.

s/ Arthur J. Schwab
Arthur J. Schwab
United States District Judge

cc: ECF Registered Counsel of Record
*and*
Marvin Dennis
42709
BUTLER COUNTY PRISON
202 S. Washington Street
Butler, PA 16001

---

[3] Further, none of the actions taken by either Det. Pokora or Officer Faino or any of the police involved in Defendant's stop and arrest on November 4, 2026, can be viewed as "blameworthy misconduct" under *Walker*, requiring the suppression of evidence.